# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

TODD OLLIS,

Plaintiff,

v.                                                           ACTION NO. 2:17cv33

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Todd Ollis brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

An order of reference assigned this matter to the undersigned.  ECF No. 12.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Ollis's motion for summary judgment (ECF No. 14) be GRANTED in part and DENIED in part, the Commissioner's motion for summary judgment (ECF No. 15) be DENIED, and the decision of the Commissioner be VACATED and REMANDED for further consideration.

## I. **PROCEDURAL BACKGROUND**

Plaintiff, Todd Ollis, protectively filed an application for a period of disability and DIB on April 3, 2013, alleging that he became disabled on January 30, 2012, due to anxiety, depression, bipolar disorder, and Crohn's disease.[1] R. 225, 269. SSA denied Ollis's application on December 5, 2013, and, upon reconsideration, on February 4, 2014. R. 108–09, 146–47. An Administrative Law Judge ("ALJ") heard the matter on October 1, 2015, and received testimony from Ollis (who was represented by counsel) and an impartial vocational expert. R. 41–71. On November 5, 2015, the ALJ denied Ollis's claim, finding that he was not disabled from January 30, 2012 through the date of the decision. R. 19–35.

On November 10, 2016, the Appeals Council denied Ollis's request for review of the ALJ's decision. R. 1–5. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481. Having exhausted all administrative remedies, Ollis filed a complaint with this Court on January 18, 2017. ECF No. 3. The Commissioner answered on March 31, 2017. ECF No. 10. In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on May 10 and June 7, 2017, respectively. ECF Nos. 14–16. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II. **RELEVANT FACTUAL BACKGROUND**

### A.   *Background Information and Hearing Testimony by Todd Ollis*

Born in 1964, Ollis completed two years of college, and was 47 years old as of the alleged, onset date of disability of January 30, 2012. R. 44. Ollis's past relevant work

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court.

experience includes work as a kitchen helper, a short order cook, chef, and retail manager.  R. 60–61.  At the October 1, 2015 hearing before the ALJ, Ollis testified that, for approximately 18 months through April 2014, he also worked for McDonald's doing maintenance, cleanup, and unloading trucks.  R. 45.  Ollis testified that he routinely lifted and carried items weighing 50 pounds and had no problems interacting with the manager at McDonald's, but stopped working due to his inability to "do the lifting or the standing that long."  R. 45, 54.

Although divorced, Ollis reported living in an apartment with his ex-wife.  R. 45–46. Ollis testified that he suffers from low back and shoulder pain, anxiety, depression, and bipolar disorder.  R. 47, 49–50, 52–53, 55.[2]  Ollis reported recently receiving mental health services from the Community Services Board ("CSB") of Suffolk.  R. 46–47, 58.  He also reported receiving medical services from his family doctor and the Tidewater Free Clinic.  R. 47, 58–59. Ollis testified about having difficulty getting medications due to insurance and finance issues, R. 47, 53, but indicated he was taking:  (1) Seroquel (for roughly three years) for anxiety/depression and it worked for him as a sleep aid, R. 47, 53–54; (2) clonazepam for bipolar mood swings, anxiety, and depression, R. 47, 53, 55; and (3) oxycodone and a fentanyl patch for back pain, R. 49.  He also testified that he has not had his "proper medications" for several years, due to lack of insurance.  R. 53.  Ollis readily admitted to a past history of abusing cocaine and alcohol and receiving treatment for the same, but stated that he ceased substance abuse three years earlier, so that he could "maintain a place to live."  R. 47–48.

Ollis testified that his back problems dated back 10 to 15 years, and after standing 15 to 20 minutes he needs to sit down due to back pain.  R. 49, 52 (reporting that his need for medical help for back pain became apparent when he stopped drinking).  He reported no back problems

---

[2] Other disabilities alleged by Ollis include Crohn's disease, right hip pain from prior surgeries, and degenerative disc disease of the cervical spine.  R. 44.

associated with sitting while testifying. R. 56. He testified to experiencing constant pain in his left shoulder dating back roughly 10 years and reported having dislocated that shoulder on multiple occasions due to a prior injury. R. 50. More recently, he attended one month of physical therapy for the shoulder and found that it caused the joint to tighten up and failed to provide pain relief. R. 50–51.

With respect to mental health, Ollis testified that he was diagnosed with bipolar disorder and anxiety attacks in 2003, and experiences mood swings, severe depression, and has difficulty dealing with and working around people, which symptoms are reduced with access to proper medication. R. 52–54, 56. He also reported that his anxiety attacks, which are accompanied by a pounding heartbeat and an inability to concentrate and focus for up to one hour, are mostly controlled by taking clonazepam. R. 55, 59 (when medicated, he has occasional "flare-up[s]" and "outbursts" towards others). He also testified that he does not talk on the telephone, other than about doctor's appointments. R. 58.

Ollis also testified that he possessed a driver's license and occasionally drove to the store to buy needed items. R. 48. At the time of the hearing, he reported weighing 275 pounds, had no problems with personal care activities, but sometimes lacked the energy to bathe or dress every day. R. 49, 59–60. Although he denied performing housework, Ollis testified that he fed the cats, watched television, occasionally cooked and washed dishes, did his own laundry, and shopped for groceries every couple of weeks. R. 57–58. He reported that he could lift and carry approximately 20 pounds using his right, dominant hand, and approximately 10 pounds with his left hand, and had no issues reaching overhead with that hand. R. 50–51.

Ollis submitted an adult function report on June 12, 2013. R. 285–92. In addition to the matters noted above, he reported that his conditions prevented him from achieving deep and

lasting sleep.  R. 286.  With respect to grooming and caring for himself, he reported failing to regularly perform such tasks and that his ex-wife reminded him when to bathe.  R. 286–87.  Although reporting that he previously "used to cook a lot," Ollis reported that he continued to fix his own meals, typically comprised of sandwiches.  R. 287.  Ollis listed vacuuming, done once a week for 20 minutes, as the sole household and yard chore that he performed.  R. 287.  Ollis also reported that he could pay bills, count change, and use a checkbook, but advised that he spent too much money and incurred overdrafts.  R. 288.  Ollis listed that he left the house four times per week, and typically drives to the store to buy food one time a week.  R. 288.  With respect to social interaction, he advised that he was unable to be with people for extended time periods and handled stress and changes in routine poorly.  R. 290–91.  Ollis reported that, due to Crohn's disease, he found it difficult to lift, squat, bend, or kneel, and that his bipolar disorder and depression interfered with his concentration and ability to complete tasks and get along with others.  R. 290.

Ollis's ex-wife, Debra Ollis, also completed a third-party function report on June 12, 2013.  R. 277–84.  She reported that she and Ollis live together and she has known him for 14 years.  R. 277.  She reported that Ollis then worked three days per week (apparently at McDonald's) and, when not at work, slept, watched TV, cooked simple meals three to four times a week, vacuumed once a week, took out trash for weekly pickup, went to a nearby grocery store once a week, occasionally fed and swept up cat fur, and showered once a week.  R. 277–80.  Ms. Ollis also reported that before his conditions began, Ollis was motivated, had ideas, liked to drive, and enjoyed work.  R. 278.  After onset, he lost motivation and interest in driving, wore the same clothes, preferred to stay in the apartment (other than when working), did not do much, no longer engaged in reading, had issues managing bank accounts and money, and required

prodding concerning bathing and grooming.  R. 277–81.  She noted that Ollis had problems relaxing and sleeping, handling stress and changes in routine, concentrating, and complained of racing thoughts and an inability to quiet his mind.  R. 278, 282–83.  With respect to social functioning, Ms. Ollis noted that Ollis found people annoying, had significantly withdrawn from talking and interacting with others, both socially and at work, and had exhibited paranoid behavior at a prior apartment in a bad neighborhood.  R. 281–83.  She reported that the condition of Ollis's knees and hips affected his ability to squat, bend, stand, and kneel.  R. 282.  Ms. Ollis also reported that Ollis cannot function without his medicine.  R. 284.

## B.    *Relevant Medical Record*

### 1.    *Pre-Onset Medical Records*

Prior to the onset date of disability of January 30, 2012, Ollis's medical history includes diagnoses of gastroesophageal reflux disease ("GERD"), as well as Crohn's disease, for which he underwent a resection of the terminal ileum in 2004 and in 2008.  R. 335, 339, 343–50, 443.

From February 2007 through September 2010, Ollis saw Dr. Jose Villongco in Roswell, GA, for mental health treatment.  R. 365–77.  The treatment notes reflect that Ollis reported having a lengthy history of anxiety, depression, and periodic bouts with alcohol and drug abuse. R. 365–77.  Dr. Villongco diagnosed Ollis with bipolar disorder and alcohol and/or marijuana dependence (sometimes in remission).  R. 366, 372–73.  He prescribed various medications at different times, including Seroquel, clonazepam, Geodon, lamitrigine, and Ollis generally responded well to the medications and treatment with Dr. Villongco.  R. 365–77.

### 2.    *Treatment with Dr. James Early*

During nine office visits from May 24, 2012 through December 30, 2013 and after apparently having moved to North Carolina, Ollis received treatment from Dr. James Early with

East Asheville Family Health Care. R. 378–403, 454–56. During his initial visit, Ollis sought to get established with a primary care physician and primarily complained of severe and worsening right hip pain, which caused him to sleep in a chair. R. 396. Dr. Early's examination revealed degenerative changes in both knees, severe right hip pain with limited range of movement and pain on weight bearing, and noted that Ollis reported having occasional flare-ups of Crohn's disease. R. 396. Dr. Early assessed hip pain with severe degeneration (avascular necrosis), anxiety disorder, and tobacco abuse, prescribed Percocet, and directed Ollis to take Advil liquid capsules and continue with clonazepam. R. 397.

After having right hip replacement surgery on July 21, 2012, Ollis reported to Dr. Early on August 9, 2012 that he planned to return to work in six weeks and that he had some right knee pain. R. 388. Dr. Early's physical examination found that, aside from right hip pain and a limp and the previously noted knee changes, Ollis exhibited normal neurological findings, normal spine range of motion, and normal upper extremity joints. R. 388–89. On October 4, 2012, Ollis reported that his right hip pain had improved, therapy was completed, and he was tolerating the switch from Percocet to Norco, which occurred on August 21, 2012. R. 384–87. During examinations on January 3 and April 4, 2013, Ollis complained to Dr. Early about abdominal pain and flare-ups and some swelling and pain with his right side and knee. R. 378, 381. Aside from the previously noted degenerative changes in Ollis's knees and a limp on the right side, Dr. Early's musculoskeletal and neurological examinations revealed normal findings. R. 379, 381–82. On January 3, 2013, Dr. Early re-started Ollis on Norco (for chronic back pain and osteoarthritis) and prescribed prednisone for Crohn's disease. R. 382. On April 4, 2013, Dr. Early directed that Ollis no longer use prednisone and prescribed Pentasa for Crohn's disease and omeprazole for GERD, and continued Ollis on Advil for hip pain and clonazepam for anxiety.

R. 379.  Ollis last saw Dr. Early on December 30, 2013, when he complained of lower back and knee pain and abdominal cramps due to inability to afford his Crohn's medication.  R. 454–56. After examination, Dr. Early added new assessments for bipolar disorder and low back pain and continued Ollis on the medications previously noted, with the addition of prescriptions for Invega, lamotrigine, and Seroquel for bipolar disorder.  R. 455–56 (noting that Ollis "goes to RHA for medications").

### 3.    *Treatment with RHA Behavioral Health*

From January through May 2013, Ollis received treatment on five occasions from RHA Behavioral for mental health matters.  R. 404–34.  Following a referral to the clinic, Ollis received a comprehensive clinical assessment on January 10, 2013 from Scott Hart, M.A., L.P.C. R. 404–21.  During the assessment, Ollis reported that:  (1) he was withdrawn and unstable, unable to hold a job, without interests, and "stuck"; (2) he was recently arrested, while in a manic state, for having repeatedly called 911 concerning the presence of people outside his house; (3) after a ten-year period of sobriety, during the preceding year he had relapsed and had been abusing alcohol, cannabis, opiates, over-the-counter sleep aids, and synthetic drugs (such as synthetic marijuana (K-2) and bath salts); (4) his concentration was moderately poor and he was unable to complete tasks, due to "internal distraction"; (5) he had extended periods of mania, with racing thoughts, flight of ideas, pressured speech, extravagant behavior, and decreased need for sleep; (6) he was anxious and had difficulty sleeping when not in a manic episode; (7) he had an extended personal and family history of substance abuse; (8) he received substance abuse treatment on multiple occasions; and (9) he was currently taking Klonopin, prednisone, and Vicodin.  R. 419–20.  Counsellor Hart assessed Ollis with "bipolar disorder depressed, severe"; alcohol, opiate, synthetic, and polysubstance dependence; knee pain; and Crohn's disease.  R.

420.   After another treatment session on January 11, 2013, Ollis received prescriptions for Geodon (for mood), Seroquel (for sleep), and Lamictal (for mood). R. 428, 431–34.

When seen on March 5, 2013, Ollis denied further substance abuse, but recited that he remained unemployed and was still "'not very functional.'" R. 426. When seen on May 3, 2013, Ollis reported that he was working at McDonald's and had been clean for approximately six months. R. 424–25. At this visit, his dosage of Geodon was modified and he was prescribed Abilify, and his prior prescriptions were continued. R. 425. Ollis's last treatment at RHA occurred on May 24, 2013, when his mood was assessed as "ok," and his hygiene, grooming, psychomotor activity, dress, eye contact, speech, thought process, associations, and thought content were all found to be within normal limits. R. 423. He also exhibited some flight of ideas, with slightly reduced attention and impaired attention and concentration, but was found to be well oriented, with an intact memory, and fair insight and judgment. R. 423. Ollis reported on this date that he had been clean for approximately seven months and experienced no cravings. R. 422.

### 4.   Treatment with Dr. Paa-Kofi Obeng and Dr. Philip Kondylis and In Motion Physical Therapy

After re-locating to Hampton Roads from North Carolina, R. 462–63, Ollis began receiving treatment from persons affiliated with the Bon Secours Health System, including at the Nansemond Suffolk Family Practice (Paa-Kofi Obeng, D.O.), at In Motion Physical Therapy, and from Dr. Philip Kondylis. R. 457–96, 527–623, 624–44. On May 7, 2014, Ollis received a new patient examination from Dr. Obeng. R. 462. Ollis told Dr. Obeng that he suffered from knee, hip, and back pain, depression, anxiety, and inflammatory bowel disease, and could not afford medications to treat the latter condition. R. 462. With respect to his knee, Ollis reported breaking it in 2011 and having pain upon bending it. R. 462. Dr. Obeng reported positive

findings: (1) for bipolar disorder and depression in his review of behavioral/psychiatric systems; and (2) for arthralgia and back pain with the musculoskeletal system. R. 464. During the course of his physical exam, Dr. Obeng noted that Ollis presented with a flat affect and that neurologically Ollis was well oriented, had normal and symmetric motor and muscle strength, a normal gait, and normal reflexes, with the exception of a diminished biceps reflex. R. 465. Dr. Obeng assessed: (1) chronic back pain and refilled a prescription for Norco; (2) avascular necrosis of the hip, status post-replacement, with continued use of Norco as needed; (3) bipolar disorder with depression and refilled his Seroquel and Invega prescriptions (with a referral for psychiatric management); and (4) Crohn's disease, noting the need to get Ollis back on medication as soon as possible, subject to insurance and cost. R. 465–66.

Ollis had seven follow-up appointments with Dr. Obeng and/or his practice from June 2014 through July 2015, repeatedly presented with a flat affect, and was regularly prescribed Norco, Klonopin (clonazepam), Seroquel, Lamictal, and Invega, and other medications noted below. R. 527–623. On June 9, 2014, Ollis reported no changes in his medical condition, but indicated that, without medications for Crohn's disease, he had frequent flare-ups. R. 613. Ollis also advised that the mental health treatment provider declined to treat him because he failed to satisfy their criteria. R. 613. Dr. Obeng referred Ollis to a gastroenterologist, continued the same medications previously noted, and also prescribed sulfasalazine (pending the gastrointestinal referral) and a Vitamin D supplement. R. 615. During a September 9, 2014 examination for back and abdominal pain, Ollis continued to report issues paying for medications and said he would follow-up with the Tidewater Free Clinic. R. 595–97.

On October 22, 2014, Philip Kondylis, M.D., examined Ollis with regard to his Crohn's disease. R. 458–60. During a systems review and physical examination, Dr. Kondylis noted,

among other things, that Ollis:  (1) had diarrhea; (2) denied recent anxiety or depression; (3) appeared to have a hernia; and (4) had a normal gait.  R. 458–59.  With respect to the Crohn's, Dr. Kondylis advised that studies were needed to assess the disease's current stage and appropriate treatment, that Ollis was overdue for a colonoscopy, and ordered a CT scan of the abdomen.  R. 460.  Ollis later advised Dr. Obeng that he could not afford these procedures.  R. 540.

On a December 9, 2014 follow-up exam with Dr. Obeng, Ollis reported having pain down his sides and his lumbar region.  R. 578.  Dr. Obeng prescribed an albuterol inhaler for Ollis's wheezing, directed him to follow-up with Dr. Kondylis, and noted that Ollis remained stable on Norco for back pain while awaiting a response from pain management.  R. 580.  Two weeks later, Ollis returned to Dr. Obeng complaining of acute back and side pain and muscle spasms in his mid to lower back.  R. 562, 564.  Dr. Obeng noted that a recent MRI, which revealed a healing rib fracture at level T9, likely triggered the spasms, prescribed Flexeril and the use of a topical compound, and directed certain back exercises.[3]  R. 563, 569–74.

On May 4, 2015, Ollis again saw Dr. Obeng, and reported the fracture of two more ribs since his last visit and feeling as if his left shoulder was dislocated.  R. 551 (noting that "he has been dealing with [shoulder problems] for many years").  Dr. Obeng found that Ollis had tenderness along his left shoulder, noted positive findings for the empty can and scratch tests on the left side, and ordered an x-ray.  R. 552–53.  In a follow-up visit on June 10, 2015, Ollis continued to complain of left shoulder pain, and Dr. Obeng's notes indicate that a June 8, 2015 x-ray found "[n]o convincing evidence of acute fracture or subluxation, [an a]bnormal sclerotic band in the superior lateral aspect of the humeral head . . . likely [due to] impaction-related

---

[3] Ollis presented the same complaints to the Western Tidewater Free Clinic on December 23, 2014.  R. 509.

changes from Hill-Sachs deformity." R. 540–41. Dr. Obeng referred Ollis to orthopedic surgery for follow-up. R. 541–42.

Ollis last saw Dr. Obeng on July 8, 2015, and advised that he had seen a Dr. Luciano for his shoulder and had begun physical therapy, which had "tighten[ed] up" the shoulder but offered no pain relief.[4] R. 529. Dr. Obeng noted that Ollis exhibited normal muscle strength bilaterally in his upper extremities. R. 530. Dr. Obeng's notes also indicated that recent x-rays of Ollis's spine showed: (1) "moderate lower level cervical spine degenerative disc changes"; (2) "[s]ubtle mild wedge deformity of lower thoracic and upper lumbar vertebra likely mild compression fractures"; (3) minimal anteroposterior offset at the L3/4 and L4/5 vertebra; and (4) degenerative disc changes. R. 530–31.

### 5. Treatment with Western Tidewater Free Clinic

Ollis also received treatment at the Western Tidewater Free Clinic on nine occasions from September 2014 through May 2015. R. 497–526. After a physical examination and the taking of a patient history recounting much of the information noted above, a nurse practitioner assessed Ollis with Crohn's disease, bipolar disorder, avascular necrosis, and right knee and lumbar pain. R. 523. She prescribed Delzicol for the Crohn's disease, and Seroquel for bipolar disorder, and referred Ollis to dental and orthopedic providers.[5] R. 521, 523, 525.

---

[4] Records from In Motion Physical Therapy show that Ollis was scheduled for 12 therapy sessions starting in June 2015 and had attended 9 such appointments through July 22, 2015. R. 624–44. On June 19, 2015, Ollis advised that his shoulder pain and instability dated back over 10 years and began increasing 18 months earlier. R. 641. He reported some left numbness in his upper extremity and expressed concern that overhead reaching would cause another dislocation. R. 641. He reported that a recent cortisone shot helped to reduce his pain to a five on a ten point scale. R. 641. Treatment records reflect that the therapy increased Ollis's shoulder strength and stability, but neither reduced nor resolved his pain. R. 627.

[5] The referral also noted that Ollis was also currently taking lamotrigine, hydrocodone, and Clonazepam. R. 525. After appointments on October 30 and November 20, 2014, a clinic provider also prescribed Pentasa (for Crohn's disease) and Celebrex. R. 513, 519, 521.

When seen at the clinic on November 25, 2014, Ollis complained of pain that prevented him from turning to his right or left sides. R. 512. He was assessed with a probable right intercostal/thoracic muscle strain. R. 512. On February 3, early April, and May 13, 2015, the clinic continued to treat Ollis for, among other things, Crohn's disease, bipolar disorder, anxiety, coughing/wheezing spells, left shoulder discomfort, and rib fractures. R. 498, 502 (noting additional COPD diagnosis and prescribing albuterol), 508 (prescribing Nicotrol).

The clinic's patient files also contained the results of several x-rays and imaging studies taken of Ollis. X-rays taken of Ollis on November 11, 2014 indicated: (1) "[n]o acute fracture[s] or significant degenerative change" in the right knee; (2) "[m]ultilevel spondylosis with a possible transitional lumbosacral vertebra"; and (3) that his right hip prosthesis remained in place with no evidence of loosening and that his left hip showed no significant degenerative change. R. 515–17. An MRI of Ollis's abdomen taken on December 11, 2014 showed: (1) liver lesions identified as "[m]ultiple hepatic hemangiomas"; (2) a healing, subacute fracture of his front, right ninth rib, with some swelling and fluid; and (3) cholelithiasis (gall stones). R. 510–11. X-rays taken on March 19, 2015 noted the presence of "mildly displaced fractures of the right seventh through ninth ribs." R. 507. Finally, a full body, bone scan taken on May 7, 2015 showed: (1) "[m]oderate to marked adjacent activity involving the posterior right [seventh through ninth] ribs corresponding to fractures"; (2) "no evidence for abnormal activity involving the lumbar spine corresponding to patient's low back pain"; (3) "[m]oderate activity seen within both knees, right greater than left, typically degenerative"; and (4) "[l]esser degree of activity seen within both shoulders and both feet, also typically degenerative." R. 499–500.

13

### 6.     Consultative Examinations and State Agency Physician Reviews

On June 26, 2013, Antoinette Wall, M.D., of North Carolina, conducted a consultative medical examination of Ollis. R. 443–47. Dr. Wall took a history of Ollis's present illnesses and he recounted his history of Crohn's disease, depression and anxiety, and substance abuse. R. 443. Ollis discussed his then current employment at McDonald's and abilities, noting he worked 20 hours per week, was able to walk for up to a few hours but always with pain, had no problems sitting, and could drive for hours without difficulty. R. 443. Dr. Wall listed Ollis's medications as Seroquel, clonazepam, Abilify, hydrocodone, Geodon, and Lamictal, but noted he reported not having taken medications for Crohn's disease for five years due to cost and receiving assistance for his mental health prescriptions from RHA. R. 443–44. Dr. Wall's systems review noted Ollis "has chronic dyspepsia, diarrhea, and constipation alternating[,] . . . joint pain of the knee and mood swings." R. 444. A physical examination of Ollis found, among other things: (1) no swelling in his extremities, normal bilateral grip and muscle strength, and left knee crepitance; (2) normal range of motion; (3) no gait abnormality and an ability to heel and toe walk and squat; and (4) an appropriate affect. R. 445–46. Dr. Wall listed her medical impressions as Crohn's disease, depression and anxiety, and substance abuse (multiple). R. 445.

On October 30, 2013, W. Jim Miller, M.D., a licensed psychologist, conducted a psychological consultative examination of Ollis and, in conjunction with doing so reviewed Ollis's work history, Debra Ollis's third-party function report, Scott Hart's intake assessment of Ollis on January 10, 2013, and Dr. Wall's report. R. 448–49. Dr. Miller also reviewed the same prescription, medical, mental health, personal, and family history described above, and also noted that Ollis reported currently working at a dollar store. R. 449–50. In assessing Ollis's mental status, Dr. Miller found him to be cooperative, prone neither to exaggeration nor

14

minimization, able to speak at a normal rate/volume, having a relevant and clear thought process, and reporting no disturbance in perception, but "endorsing suspicions toward others" and noting that people do not like him. R. 450. Dr. Miller assessed Ollis's cognition by examining his orientation, immediate retention and recall, recent and remote memory, current store of information, ability to perform calculations, abstract thinking, and judgment and insight. R. 450–51. After doing so, he concluded that Ollis "functions in [the] high average range of intelligence." R. 451. Dr. Miller diagnosed Ollis with bipolar disorder, Crohn's disease, and occupational and social problems. R. 451. He concluded that: (1) Ollis's "ability to understand, retain, and follow instructions" and "to sustain attention in order to perform simple, repetitive tasks appeared to be good"; (2) given Ollis's irritation by and avoidance of social contact with others, his "ability to relate to fellow workers and supervisors appear[ed] to be quite poor"; and (3) his "ability to tolerate the stress and pressures associated with day-to-day work activity is felt to be very poor." R. 451–52.

On November 14, 2013, Ellen Huffman-Zechman, M.D., a state agency physician, reviewed Ollis's medical records and assessed his physical RFC. R. 81–84. Dr. Huffman-Zechman opined, with respect to exertional limitations, that he could occasionally lift and/or carry objects weighing up to twenty pounds and frequently lift and/or carry ten pounds, that he could stand and/or walk, as well as sit, about six hours in an eight-hour workday, and that he had unlimited ability to push and/or pull and operate foot and hand controls, subject to the limits noted above. R. 82. As for postural limitations, Dr. Huffman-Zechman concluded that, due to his hip replacement, left knee crepitance, Crohn's disease, and obesity, Ollis could never climb ramps, stairs, ladders, ropes, or scaffolds, but could occasionally crawl, crouch, bend, balance,

kneel, and stoop.   R. 82.   Dr. Huffman-Zechman found no manipulation, visual, or communicative limitations.  R 83.

On February 4, 2014, Frank Virgili, M.D., another state agency physician reviewed the medical evidence and primarily concurred with Dr. Huffman-Zechman's conclusions, except as to certain physical, functional abilities.  R. 120–22.  Dr. Virgili concluded that Ollis could frequently kneel, balance, crawl, and climb ramps and stairs, and only occasionally climb ladders, ropes, and scaffolds, bend, stoop, and crouch.  R. 120–21.

On November 14, 2013, Brett A. Fox, Psy.D., a state agency psychologist reviewed Ollis's records and assessed his mental RFC.  R. 84–87.  With respect to Ollis's capacities pertaining to memory and understanding, Dr. Fox reported that the evidence indicates that Ollis "is able to remember work locations and procedures, and . . . is able to understand and remember short, simple instructions."  R. 85.  With respect to concentration and persistence, Dr. Fox noted the absence of "significant problems . . . with basic attention and concentration," but found that "[p]ersist[e]nce and pace would be limited at times due to psychiatric issues."  R. 85 (noting moderate limitations in maintaining attention and concentration for extended periods, in working with others, and in completing a normal workday/week without symptoms and performing at a consistent pace).  Dr. Fox also found Ollis to be moderately limited in his ability to interact with the public, in dealing with a supervisor, in interacting with co-workers, and in behaving in a socially appropriate fashion.  R. 85–86.  With respect to adaptation, Dr. Fox found Ollis to be moderately limited in responding to workplace changes and assessed that, while capable of handling routine stress and pressure, Ollis would likely react with frustration and irritability to highly stressful circumstances.  R. 86.  Dr. Fox noted that, when treated and properly medicated and absent reversion to substance abuse, Ollis "tends to be stable."  R. 86.  In light of his past

16

work history and the absence of evidence of deteriorating mental health over time, Dr. Fox opined that Ollis "should be capable of completing simple tasks in a work setting where a great deal of interpersonal interaction is not required." R. 86.

On February 4, 2014, Nancy Herrera, Ph.D., another state agency psychologist, reviewed the evidence and primarily concurred with Dr. Fox's conclusions. R. 122–25. Dr. Herrera further noted that Ollis "[w]ould do best in [a] job with limited interpersonal demands and limited public contact." R. 124. Based in part upon these state agency medical and mental health reviews, Ollis was assessed, initially and on reconsideration before the ALJ hearing, as not disabled and able to perform light work. R. 88, 126.

## C.      *Hearing Testimony of Vocational Expert Tricia Oakes*

Tricia Oakes, a vocational expert ("VE"), also testified before the ALJ. R. 41, 60–70. The first hypothetical, posed by the ALJ, described a person with an RFC for light work diminished by lift/carry limitations and push/pull limitations for the left arm and hand; a sit/stand option of at least thirty minutes for comfort; and limited to simple, repetitive job tasks without frequent interaction with either the public or fellow workers. R. 62–63. VE Oakes testified that jobs existed for such a person in the national economy as a small parts assembler, electronics assembly worker, or laundry folder. R. 63. During cross-examination, the VE responded to two, additional hypotheticals posed by plaintiff's counsel. First, the VE conceded that, if the hypothetical person posed by the ALJ could only be on task 85% of a workday, was unable to interact appropriately with others, and was unable to handle the stresses of a competitive workplace, then such restrictions, either singly or in combination, precluded "work in the competitive market." R. 64–65. Second, if the limitations from the ALJ's first hypothetical applied, except that the hypothetical person could walk/stand for only two hours and required a

sit/stand option, the VE testified light work would be precluded, but sedentary jobs such as a document preparer, check weigher, or final assembler existed. R. 67–70.

## III. THE ALJ's DECISION

To evaluate Ollis's claim of disability[6], the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the ALJ considered whether Ollis: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work in light of his residual functional capacity; and (5) had an impairment that prevents him from engaging in any substantial gainful employment. R. 132–41.

The ALJ found that Ollis met the insured requirements[7] of the Social Security Act through September 30, 2017, and he had not engaged in substantial gainful activity since January 30, 2012, his alleged onset date of disability. R. 24 (noting that Ollis's earning from McDonald's failed to qualify as substantial gainful activity).

At steps two and three, the ALJ found that Ollis had the following severe impairments: (a) degenerative disc disease; (b) degenerative joint disease (left shoulder, right hip, and right

---

[6] To qualify for SSI and/or DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *accord* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a).

[7] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

knee); (c) bipolar disorder; (d) depression; (e) anxiety; and (f) Crohn's disease "by history." R. 24. The ALJ classified Ollis's other asserted impairments, including obesity, GERD, esophagitis, hernia, and rib fractures, as non-severe, because they responded to medication or required no significant medical treatment or did not otherwise continuously impose functional limitations upon him. R. 24–25. The ALJ further determined that Ollis's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 25–27.

The ALJ next found that Ollis possessed a residual functional capacity ("RFC") to perform light work, *see* 20 C.F.R. § 404.1567(b), subject to the limitations that: (a) "[h]e can lift/carry [ten] pounds frequently and [twenty] pounds occasionally with the right dominant arm and hand"; (b) "[h]e can lift/carry only [ten] pounds occasionally with the left non-dominant arm and hand"; (c) "[h]e cannot push/pull more than [ten] pounds occasionally with the left arm and hand"; (d) "[h]e can sit eight hours in an eight-hour workday and walk/stand six hours in [such a workday,] . . . but he should be allowed an alternating sit/stand option at least each [thirty] minutes for comfort"; and (e) he can perform only "simple, repetitive job tasks without frequent interaction with coworkers or the general public." R. 27. Based upon this RFC assessment, the ALJ determined at step four that Ollis could not return to his past relevant work. R. 33.

Finally, at step five, and after considering his age, high school education, work experience, and RFC, the ALJ found that Ollis could perform other jobs, such as a small parts assembler, electronics assembly worker, and laundry folder, which existed in significant numbers in the national economy. R. 34. Accordingly, the ALJ concluded that Ollis was not disabled

from January 30, 2012 through the date of the ALJ's decision and was ineligible for a period of disability, DIB, or SSI benefits.  R. 34–35.

## IV.  STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chatter*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record is

devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V. ANALYSIS

### A.   *The ALJ failed to appropriately account for Ollis's moderate limitations in his ability to concentrate, persist, and maintain pace.*

The first two of Ollis's three arguments for overturning the ALJ's decision arise from the ALJ's determination that Ollis has "moderate difficulties" with respect to maintaining concentration, persistence, and pace, due to his mental health impairments.  R. 24, 26.  Having found the existence of such limitations, Ollis argues that the ALJ must either account for them in his hypothetical question to the VE or explain why such functional problems did not translate into a limitation in Ollis's RFC, as required by *Mascio v. Colvin,* 780 F.3d 632, 638 (4th Cir. 2015).  Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") 21–24, ECF No. 14-1 at 21–24. Contending that the ALJ performed neither task here, Ollis seeks a remand.

The regulations provide that, after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC.  20 C.F.R. §§ 404.1545, 416.945.  The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week."  Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2 (July 2, 1996).  An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3.  After doing so, the ALJ can express the RFC in terms of the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional limitations established by the evidence.  *Id.*  The RFC must include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  *Id.* at *7.  The determination of RFC is based

upon a consideration of all the relevant medical and other evidence[8] in the record. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The ALJ uses that RFC to determine whether the claimant can perform his past relevant work, and whether the claimant can adjust to any other work that exists in the national economy. *Id.* at §§ 404.1545(a)(5), 416.945(a)(5).

Several months before the ALJ's decision in this case, the Fourth Circuit clarified the requirements of SSR 96-8p and ruled that an ALJ does not account for a claimant's moderate limitations in concentration, persistence, or pace by limiting the RFC to simple or routine tasks, or unskilled work. *Mascio*, 780 F.3d at 638. *See also Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180–81 (11th Cir. 2011); *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009) (*per curiam*); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996). The Fourth Circuit observed that "the *ability to perform simple tasks* differs from the *ability to stay on task*. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638 (emphasis added).

Accordingly, *Mascio* requires that, upon finding mental functional difficulties at step three, an ALJ must either: (a) include limitations in the hypothetical addressed to the VE to account for the same; or (b) explain "why [the] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in [the claimant's RFC]." *Id.* (noting that, if an ALJ explains how the limitation "does not affect [a claimant's] ability to work, . . . it would [be] appropriate to exclude it from the hypothetical").

In this case, the ALJ determined at step three that Ollis labors under moderate difficulties in social functioning and with regard to concentration, persistence, and pace. R. 26. When

---

[8] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c).

determining Ollis's RFC, the ALJ considered his testimony regarding his impairments and symptoms, summarized the treatment records, symptoms, and the utility of his medications, considered Ollis's activities of daily living and his ex-wife's reporting about Ollis, and addressed the opinion evidence.  R. 28–33.  With respect to the opinion evidence, the ALJ assigned moderate weight to the opinions of Dr. Miller, the consultative psychological examiner ("CE").  R. 32.  While endorsing the CE's finding that Ollis possessed a "good ability to understand, retain, and follow instructions and sustain attention [needed] to perform simple, repetitive tasks," the ALJ mostly rejected Dr. Miller's conclusions that Ollis's ability to interact with coworkers and supervisors was "quite poor" and that his ability to handle the stresses of daily work were "very poor."  R. 32.  The ALJ did so reasoning that Dr. Miller's findings were "vague," gave too much credit to Ollis and his ex-wife's statements, and were at odds with his conservative treatment, his activities of daily living, and his work for a time at McDonald's.  R. 32.

The ALJ accorded "greater weight" to the opinions of the non-examining, state agency, psychological consultants (Drs. Fox and Herrera), and their conclusion that Ollis could complete "simple tasks in a work setting where a great deal of interpersonal interaction is not required."  R. 32.  The ALJ, however, failed to address their findings that Ollis was moderately limited in performing at a consistent, scheduled pace, in maintaining attention and concentration for extended periods, in adapting to workplace change, in working and interacting with others, and in avoiding psychiatric symptoms during a typical workday/week.  R. 85–86, 123–24.

Nevertheless, the ALJ determined that Ollis possessed the RFC to perform light work, subject to certain lift/carry limitations with respect to his right and left arms, push/pull restrictions with his left arm, with an alternating sit/stand option every [thirty] minutes, and the restriction that he perform only "simple, repetitive job tasks without frequent interaction with

coworkers or the general public." R. 27. As noted above, Ollis argues that this RFC, as incorporated into the ALJ's question to the VE, fails to account for and differentiate between the ability to perform a simple task and the ability to persist, concentrate, and consistently perform such a task five days a week, eight hours a day. *See* SSR 96-8p, 1996 WL 374184, at *2. The Commissioner disagrees and argues that remand is unnecessary both because the "ALJ's RFC determination and hypothetical question to the VE accurately accounted for [Ollis's] work-related mental limitations," and the "ALJ thoroughly explained the reasoning behind his mental [RFC] finding and why the evidence warranted no greater limitation." Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 18, 20, ECF No. 16 at 18, 20.

The Commissioner's first contention is not persuasive. *Mascio* explicitly held that a limitation to simple, routine tasks and unskilled work does not adequately account for limitations in concentration, persistence, or pace. *Mascio,* 780 F.3d at 638. Similarly, district courts in the Fourth Circuit have routinely held that remand is necessary where the ALJ limits a claimant to simple, routine, repetitive tasks, in an effort to address moderate limitations in concentration, persistence, and pace. *See Shaw v. Colvin*, No. 2:15cv432, 2016 WL 6584927, at *7–8 (E.D. Va. Sept. 28, 2016), report and recommendation adopted by 2016 WL 6573957 (E.D. Va. Nov. 3, 2016); *Boyd v. Colvin*, No. 3:14cv673, 2015 WL 5972482, at *2 (W.D.N.C. Oct. 14, 2015); *Pinkerton v. Colvin*, No. 5:14cv173, 2015 WL 5972488, at *2 (W.D.N.C. Oct. 14, 2015); *Jackson v. Colvin*, No. 3:14cv24834, 2015 WL 5786802, at *3 (S.D.W. Va. Sept. 30, 2015); *Wedwick v. Colvin*, No. 2:14cv267, 2015 WL 4744389, at *22–23 (E.D. Va. Aug. 7, 2015); *Hill v. Comm'r Soc. Sec. Admin.*, No. GLR-14-2872, 2015 WL 1893308, at *2–3 (D. Md. Apr. 24,

2015).[9] Thus, the ALJ's "simple repetitive job tasks" limitation is deficient in addressing the problem identified in *Mascio*.

Nor does the ALJ's addition of a restriction for infrequent interaction with the public and coworkers solve the problem. R. 27, 62-63. This is so because the interaction limitation is directed to addressing a limitation in Ollis's social functioning, rather than his additional, moderate limitations in concentration, persistence, and pace. *See Watson v. Colvin*, No. 2:15cv407, 2016 WL 4154920, at *4–5 (E.D. Va. Aug. 3, 2016) (remanding where the ALJ limited the claimant to "simple, repetitive tasks with training duration up to a month . . . only occasional interaction with the public, co-workers and supervisors"); *see also Baez v. Colvin*, No. 2:14cv628, 2015 WL 9652888, at *13 (E.D. Va. Dec. 7, 2015) (remanding where the ALJ limited the claimant to "only occasional contact with coworkers, supervisors, and/or the general public due to limitations in social functioning; and only simpl[e], routine, repetitive tasks, due to limitations in concentration, persistence, or pace"), report and recommendation adopted, No. 2:14cv628, 2016 WL 69900 (E.D. Va. Jan. 5, 2016); *Handy v. Comm'r, Soc. Sec. Admin.*, No. SAG-09-166, 2015 WL 9302972, at *2–3 (D. Md. Dec. 22, 2015) (remanding where the ALJ limited the claimant to "simple, routine, repetitive tasks involving short, simple instructions in an environment with few workplace changes, no public contact, and only brief, infrequent contact with supervisors and coworkers not requiring teamwork or collaboration"); *Taylor v. Colvin*, No. 7:14cv00616, 2015 WL 7308680, at *1–2 (W.D. Va. Nov. 19, 2015) (remanding where the ALJ limited the claimant to "unskilled work not involving more than occasional interactions with the

---

[9] On the other hand, district courts in the Fourth Circuit have found an ALJ complies with *Mascio* by limiting claimants to non-production work or work not performed at an assembly-line pace, because these limitations account for a claimant's difficulty with staying on task. *See Baker v. Colvin*, No. 3:15cv637, 2016 WL 3581859, at *3–4 (E.D. Va. June 7, 2016) (collecting cases); *Sizemore v. Colvin*, No. 5:15cv53, 2016 WL 483140, at *2–3 (W.D.N.C. Feb. 5, 2016); *Parker v. Colvin*, No. 3:14cv502, 2015 WL 5793695, at *23 (E.D. Va. Sept. 29, 2015). The ALJ, however, applied no such limitation in this case.

public"); *Carr v. Colvin*, No. 7:14cv393, 2015 WL 1886551, at *1–4 (W.D. Va. Apr. 15, 2015) (remanding where the ALJ limited the claimant to "performing a low stress job, which means that she can understand, remember, and carry out only simple instructions and complete repetitive, unskilled tasks in a position that requires only occasional interaction with the public"). For these reasons, the Court finds that the hypothetical question posed to the VE failed to adequately account for the ALJ's determination of Ollis's moderate difficulties with respect to concentration, persistence, and pace.

This leaves the Commissioner's alternative and primary argument that the ALJ sufficiently explained why Ollis retained the RFC to work, in spite of such limitations. The Commissioner argues that the ALJ's review and discussion of the medical and other evidence establishes that Ollis retains the ability to work at "simple, repetitive job tasks," notwithstanding his mental functional limitations. Def.'s Mem. 20–23. The Court disagrees.

As recognized in the ALJ's analysis at steps two and three, R. 24–27, two recurring themes in the record are Ollis's longstanding mental health impairments and his moderate problems with concentration, persistence, and pace. *See., e.g.,* R. 85 (noting "persist[e]nce and pace would be limited at times due to psychiatric issues"); R. 123 (same); R. 278, 282–83 (noting racing thoughts and problems in concentrating, handling stress, and adapting to change); R. 423, 425 (documenting impaired attention and concentration in May 2013); R. 427 (noting impaired attention and concentration in March 2013); R. 431–34 (noting racing thoughts, episodes of mania, poor concentration, and inability to complete tasks in January 2013); R. 451–52 (noting very poor ability to handle stress and pressure associated with daily work in October 2013).

Apparently seeking to counterbalance such concerns, the Commissioner argues that the ALJ also noted other, more favorable, findings relative to Ollis's mental state. Specifically, on various occasions, Ollis exhibited above average intelligence, normal, coherent thought processes and cognition, a stable mood, fair to reasonable insight and judgment, intact memory, could follow instructions, and maintain attention while performing simple tasks. R. 31–32. While these observations about Ollis's mental state and abilities undoubtedly touch upon whether he can concentrate, persist, and maintain pace during a part of any given work day, the psychological opinion evidence also establishes that Ollis exhibited the latter functional difficulties, often while simultaneously presenting with the more favorable ones noted above.[10] *See, e.g.,* R. 85–86, 122–24, 450–52. Stated another way, the opinion evidence indicates that the presence of these favorable indicators does not preclude the existence of the negative functional limitations which the ALJ found established by the record. Therefore, the favorable mental status observations are, in and of themselves, insufficient to explain whether Ollis could work full-time on a weekly basis. *See Mascio*, 780 F.3d at 638 (noting "the ability to perform simple tasks differs from the ability to stay on task").

Similar analysis pertains to the ALJ's observation about Ollis's activities of daily living and part-time employment. That Ollis is able to feed a cat, watch TV, occasionally cook a simple meal and wash dishes at home, drive a car, and attend an AA meeting, R. 28-29, does not answer the question whether, in spite of the mental limitations found by the ALJ, he can

---

[10] This is particularly evident in the CE's report. Dr. Miller's observation that Ollis retained the attention span needed to perform simple, repetitive tasks, but was ill-equipped to handle the stress and pressure of the daily workplace, R. 451–52, is of a piece with the *Mascio* court's recognition of the distinction between the capacity to perform a task and the capacity to attend to that task throughout a work week. *Mascio*, 780 F.3d at 638. Nevertheless, even if the Court accepted the ALJ's endorsement of Dr. Miller's former conclusion and his discounting of the latter, the former conclusion is, without more, insufficient to resolve the mental functional limitations found by the ALJ and identified by the state agency physicians.

consistently work for an entire week.  The same is true with respect to Ollis's prior, *part-time* work at McDonald's.  If, as noted by the ALJ, Ollis left even that part-time job because "he could no longer meet the job's demands and could not do the required lifting and standing," R. 28, the fact of such work cannot bear the weight that either the Commissioner or the ALJ seeks to ascribe to it.  Indeed, knowing of Ollis's daily activities and restaurant employment, the consultative psychological examiner (Dr. Miller) opined that Ollis possessed a "very poor" capacity to deal with the strains and tensions of a full-time job. R. 448, 451–52.

Although the ALJ gave little weight to this aspect of the CE's report, he nevertheless elected to attribute greater weight to the opinions of the non-examining, state agency psychologists.  R. 32.  Yet, while relying upon their conclusion that Ollis was "*capable of completing simple tasks* in a work setting where a great deal of interaction is not required," R. 32 (emphasis added), the ALJ nowhere recited, discussed, or explained how he reconciled their (and his own) conclusions about Ollis's problems in concentrating, persisting, and keeping pace throughout the work week.  R. 85 (noting moderate limitations in maintaining attention and concentration for extended periods, performing at a consistent pace, and in completing normal workday/week without psychiatric symptoms).  This failure is troubling because, when presented with a hypothetical claimant who could only be on task 85% of the workday, who is unable to interact appropriately with others, and who could not handle the stresses of a competitive workplace, VE Oakes testified that such restrictions, either singly or in combination, precluded "work in the competitive market."  R. 65–66; *see Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (specifying that, in order to be relevant, "a vocational expert's opinion . . . must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments") (citations omitted).

28

Thus, the Court is in a situation not unlike that encountered by the Fourth Circuit in *Mascio*. Specifically, the reasons offered in support of the ALJ's ruling are inadequate to address the mental functional limitations at issue. Also, the absence of an explanation hampers judicial review and leaves the Court to speculate about why the ALJ jettisoned the very mental functional limitations he identified when elucidating Ollis's RFC and questioning the VE. For these reasons, the Court cannot conclude that the ALJ's RFC determination is supported by substantial evidence.[11] A remand is necessary for the ALJ to explain whether and how Ollis could perform light work despite his moderate mental functional limitations, and to do so in a way that is reviewable by the Court.

---

[11] Ollis also challenges the ALJ's RFC determination for discarding the postural limitations (pertaining to climbing, balancing, stooping, kneeling, crouching, and crawling) proposed by the two state agency doctors reviewing Ollis's medical conditions. Pl.'s Mem. 24–27; R. 82–83, 120–21. While giving moderate weight to Drs. Huffman-Zechman and Virgili's opinions, the ALJ declined to impose *any* postural limitations in the areas noted above, stating that he did "not find a basis to limit [Ollis's] postural activities as extensively as [the two doctors]." R. 33. Although not entirely clear, it appears that the ALJ did so because he deemed these, and other restrictions, as "inconsistent with [Ollis's] conservative treatment and physical exams, . . . [showing that] he has good strength and range of motion, and can squat and walk without abnormality." R. 33. Further, the ALJ incorporated additional restrictions into the RFC, such as the limitation pertaining to lesser lifting and carrying with the left arm and hand and the sit/stand option, based upon Ollis's complaints concerning such matters. R. 33. To the extent that Ollis argues against the discarding of the postural limitations based upon medical records in the periods directly before and after Ollis's hip replacement in July 2012, *see, e.g.,* R. 396–97, 378–82, 388–89, the Court rejects that claim because other evidence documents that Ollis's hip condition and gait stabilized over time, after replacement. Other factors, however, do support Ollis's claim that the ALJ improperly discarded *all* postural limitations from the RFC. These include: (1) the fact of Ollis's right hip replacement, R. 388; (2) the ALJ's finding of severe impairments for Crohn's disease and degenerative disc and joint disease affecting Ollis's back, left shoulder, right hip, and right knee, R. 24; (3) imaging of Ollis's spine and joints showing some degenerative and other changes, R. 499–500, 515–17, 530–31, 540–41; and (4) the repeated issuance of narcotic and other prescriptions to Ollis for chronic pain associated with such matters, R. 49, 382, 455, 465–66, 521, 531, 542, 553, 563, 580, 597, 615, 641 (cortisone injection). In view of the foregoing, the Court agrees that the ALJ's decision not to include *any* of the postural limitations discussed by the two state agency physicians is not supported by substantial evidence. Accordingly, the ALJ must revisit that matter on remand, as well.

**B.**     ***Substantial evidence supports the ALJ's finding that Ollis's statements about the intensity, persistence, and limiting effects of his symptoms were only partially credible.***

Ollis next asserts that the ALJ incorrectly found his statements about the intensity, persistence, and limitations resulting from his symptoms only partly credible. Pl.'s Mem. 27–29. Ollis argues that the ALJ erred in denying full credibility by improperly relying upon work allegedly performed nearly ten years before the alleged onset date of disability, by suggesting that his activities of daily living indicated he could perform and sustain substantial gainful activity, by giving short shrift to the effect of Ollis's inability to afford medical care on his treatment history and to his overall history of seeking medical and mental health treatment, and by assigning only moderate weight to his ex-wife's statements about the effect of Ollis's conditions upon him. *Id.*

When assessing a claimant's statements about symptoms, an ALJ must engage in the two-step inquiry detailed in 20 C.F.R. § 404.1529 by evaluating: (1) whether an underlying medically determinable impairment was established by objective medical evidence that could reasonably be expected to produce a claimant's symptoms, and (2) if so, the extent to which such symptoms limited a claimant's functioning and ability to work, based upon their intensity, persistence, and limiting effects. *See Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017); *Craig*, 76 F.3d at 594–95. At the second step, an ALJ must "assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). To evaluate the intensity and persistence of a claimant symptoms, the ALJ must consider all the evidence, including the objective medical evidence, the claimant's daily activities, various facets of any asserted pain (including its intensity, location, and frequency), any events giving rise to symptoms, medical treatments and

medications and their effectiveness, any other pain relief measures, and other factors about the claimant's functional limitations and restrictions due to pain.   20 C.F.R. §§ 404.1529(c), 416.929(c).  In conducting this inquiry, an ALJ cannot discount a claimant's subjective evidence of pain intensity based solely upon objective medical findings.  *Lewis*, 858 F.3d at 866 (citations omitted).

The parties' dispute here concerns only the ALJ's analysis at step two noted above, because the ALJ found that Ollis's impairments could reasonably be expected to cause his symptoms.  R. 28.  At step two, the ALJ found Ollis's statements about the intensity, persistence, and limiting effects of his symptoms only partially credible.  R. 28.  As grounds therefor, the ALJ thoroughly and extensively reviewed the defendant's part-time work after the alleged onset date, the activities of daily living, the course of treatment for Ollis's various impairments, the results of imaging studies and physical and mental examinations by treating sources, the results of CE physical and mental health examinations, and the opinions rendered by non-treating sources.  R. 28–33.

Ollis's first attack upon this analysis is frivolous.  Notwithstanding a typographical error in the opinion,[12] R. 28, the ALJ did not, as Ollis contends, predicate the credibility determination on work Ollis performed "nearly [ten] years prior to . . . [the alleged onset date of disability.]"  Pl.'s Mem. 27.   Instead, the ALJ mistakenly and obviously referred to Ollis's work for McDonald's during 2013 and 2014, R. 45, which the ALJ expressly and correctly noted elsewhere in the first full paragraph on the same page containing the typographical error noted above.  R. 28 (noting Ollis "last worked in April 2014 . . . at a McDonald's").

---

[12] The sentence in question reads:  "Between 2003-2004, he worked about a year and a half at a McDonald's doing maintenance work and lifting up to 50 pounds (claimant hearing testimony)." R. 28.

Second, Ollis suggests that the ALJ erred in finding that his occasional activities of daily living indicated that Ollis "can thus perform and sustain [substantial gainful activity.]" Pl.'s Mem. 27. The ALJ, however, found something different; namely, that Ollis's "activities are not entirely consistent with disability." R. 28. The activities cited by the ALJ included: Ollis's performance of part-time work at McDonald's for 18 months; his interaction with a manager there without incident; his driving; his occasional shopping, cooking, and washing dishes; his grooming; his care for pets; and his attendance at AA meetings. R. 28–29. Because the ALJ's actual finding is well-taken and supported by substantial evidence, the Court rejects Ollis's second argument.

Third, Ollis argues that, in noting his conservative treatment and the absence of hospitalizations or emergency room visits as suggestive of non-disabling impairments, R. 29, the ALJ ignored the limiting impact of Ollis's unemployment and impecuniousness on the treatment record. This argument also lacks merit. The ALJ did not ignore Ollis's financial situation and access to medication in deciding the case. As noted above, the ALJ's decision recounts the only time period during the period of adjudication during which Ollis worked part-time. R. 28. The decision also notes medical records reflecting, for example, that Ollis told a provider in May 2014 that he last saw a gastrointestinal doctor in 2009 and was not being treated for inflammatory bowel disease because "he cannot afford the medication." R. 29, 463, 467 (also noting that "patient states that he was going to a state funded mental institution that provided his medication and therapy"), 519 (noting patient has Crohn's disease but has been "off med. since approx. 2010 unable to afford med."). The ALJ also correctly noted that, when on medication in May 2015, Ollis's medical records reflect "Crohn's – under control." R. 29, 498 (record from Western Tidewater Free Clinic also noting "some abdominal pain"). With respect to his bipolar

32

disorder, the decision also cites to medical records indicating that (as of September 26, 2014) Ollis had been off medication since April 2014 and his depressive symptoms increased during that time period.  R. 29, 523.  Finally, in discussing and discounting certain evidence, the ALJ noted that it failed to "adequately account for what appears to be the claimant's positive response to medication *when he is able to take it.*"  R. 32 (emphasis added).  This evidence shows that the ALJ well-knew of and considered plaintiff's issues in accessing medication and treatment. Notwithstanding this, the treatment record is sufficiently varied, lengthy, and robust for the ALJ to have fully assessed the extent of Ollis's impairments, as well as the credibility of his statements about his symptoms.

Finally, Ollis argues that the ALJ erred in concluding that the third-party function report completed by his ex-wife (Debra Ollis) was entitled to moderate weight and was only "partially credible" due its inconsistency with the medical evidence and the author's bias.  R. 29, 33, 277–84.  Although Ollis does not specify how that conclusion impacts the ALJ's assessment of his credibility, it may be argued that, if the ALJ undervalued evidence corroborating Ollis's statements, the error may have affected analysis of Ollis's credibility.  Assuming this is Ollis's contention, the Court declines to credit it here.  In her third-party function report, Debra Ollis described Ollis's impairments and symptoms in a manner highly similar to Ollis's own description of them when testifying and in his function report.  R. 45–60, 285–92.  Therefore, to the extent the ALJ had grounds for accepting or rejecting one, those grounds equally applied to the other.

This leaves the question whether substantial evidence supports the ALJ's assessment of Ollis's credibility.  With the exception of the deficiencies identified above that warrant remand, the ALJ comprehensively and carefully reviewed the medical and other evidence pertaining to

Ollis's impairments and compared it to Ollis's statements about the intensity, persistence, and limiting effects of his symptoms.  Upon doing so, the ALJ determined that the latter were less than fully credible.  R. 28.  After review of the ALJ's decision and the record, the Court is satisfied that this determination is supported by substantial evidence, including the nature and course of Ollis's treatment (particularly following the replacement of his right hip and his return to sobriety after January 2013), the response of his conditions to medication (when available), his activities of daily living, his prior, part-time work and ability to interact with his boss, the results of physical and mental examinations, and the opinions of the consultative examiners and state agency physicians.

## VI.  RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 14) be GRANTED in part and DENIED in part, the Commissioner's motion for summary judgment (ECF No. 15) be DENIED, and the decision of the Commissioner be VACATED and REMANDED for further consideration.

## VII.  REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P.

72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 18, 2017

35